## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

**RED CLIFF BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS**

|  |  |
|---|---|
| **Plaintiff,** | **Civil Action No. _____** |
| **vs.** | **JURY TRIAL DEMANDED** |

**THE 3M COMPANY, f/k/a Minnesota
Mining and Manufacturing Co.;
AGC CHEMICALS AMERICAS INC.;
AMEREX CORP.;
ARKEMA INC.;
ARCHROMA MANAGEMENT LLC;
BASF CORPORATION;
BUCKEYE FIRE EQUIPMENT CO.;
CARRIER GLOBAL CORP.;
CHEMDESIGN PRODUCTS INC.;
CHEMGUARD INC.;
CLARIANT CORP., individually and as
successor in interest to Sandoz
Chemical Corporation;
CORTEVA, INC., individually and as
successor in interest to DuPont
Chemical Solutions Enterprise;
DEEPWATER CHEMICALS, INC.;
DUPONT DE NEMOURS INC., individually
and as successor in interest to DuPont
Chemical Solutions Enterprise;
DYNAX CORP;
E. I. DUPONT DE NEMOURS AND
COMPANY, individually and as successor
in interest to DuPont Chemical Solutions Enterprise;
JOHNSON CONTROLS INTERNATIONAL PLC,
including any all intermediate companies owned
or controlled in whole or part relating to
Tyco Fire Products, L.P. and/or Chemguard, Inc.;
KIDDE-FENWAL, INC., individually and as
successor in interest to Kidde Fire Fighting, Inc.;
NATION FORD CHEMICAL CO.;
NATIONAL FOAM, INC.;**

1

**THE CHEMOURS COMPANY, individually
and as successor in interest
to DuPont Chemical Solutions Enterprise;
THE CHEMOURS COMPANY FC, LLC,
individually and as successor in interest to
DuPont Chemical;
TYCO FIRE PRODUCTS L.P. individually
and as successor in interest to The Ansul
Company;**

              **Defendants.**

---

## COMPLAINT

Plaintiff, RED CLIFF BAND OF LAKE SUPERIOR CHIPPEWA INDIANS ("Plaintiff" or "Tribe"), complains and alleges against each and every Defendant, and their agents, as follows:

## INTRODUCTION

1.      Forever, the Tribe has depended on natural rivers, lakes, and streams to sustain the life of its members. The freshwater flowing from Lake Superior is the Tribe's primary source of hydration. Indigenous fish nourish the Tribe physically and economically. Now, these Tribal waters and fish are contaminated with manmade "forever chemicals" known to cause cancer and other diseases, threatening the health, welfare, and rights of the Tribe. The Tribe brings this action against Defendants, the manufacturers and distributors of these chemicals and/or products containing or resulting in these chemicals, to protect the Tribe's health, safety, and welfare, and to restore the natural environment of its lands and waters and protect its rights.

2.      Specifically, Plaintiff brings this action for the costs required to remediate the presence of Polyfluoroalkyl substances of "PFAS" chemicals – including, but not limited to, Perfluorooctanoic acid ("PFOA"), Perfluorooctanesulfonic acid ("PFOS"), Perfluorhexanoic acid ("PFHxA"), Perfluoropentanoic acid ("PEPA"), Perfluoroheptanoic acid ("PFHpA"),

Pentafluorobenzoic acid ("PFBA"), Perfluorobutanesulfonic acid ("PFBS"), Perfluorononanoic acid ("PFNA"), Perfluorodecacanoic acid ("PFDA"), and Perfluorohexane Sulfonic Acid ("PFHS"), as well as any and all hazardous chemicals produced by Defendants (collectively referred to herein as "PFAS"), -- found in the Tribe's waters, flora, aquatic life, fauna, and land.

3.　　　Defendants manufactured, marketed, and sold aqueous film-forming foam ("AFFF"), a firefighting product used to control and extinguish aviation, marine, fuel, and other flammable liquid fires ("the AFFF Products").

4.　　　Defendants' AFFF Products contained per- and poly-fluoroalkyl substances ("PFAS") - chemicals that Defendants have known for decades would contaminate natural water sources and, likewise, cause adverse health, environmental, and cultural effects of the Tribe.

5.　　　PFAS chemicals that seep into the soil and water are dangerous because they are mobile, persist in the environment, bioaccumulate in individual organisms, aquatic life, and humans, and bio magnify up the food chain. Once PFAS chemicals get into the environment, water, soil, aquatic life, mammals, and/or humans, the PFAS chemicals remain forever, hence their common name of "forever chemicals."

6.　　　PFAS chemicals are associated with significant adverse health effects in humans, including but not limited, to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

7.　　　Defendants were aware since the 1960s and the 1970s that PFAS are toxic, do not biodegrade, are persistent in the environment, move easily through soil and groundwater, and pose a significant risk to human health and safety. Yet, Defendants elected to manufacture and sell products utilizing these chemicals without warning the public or government entities and placing

profits over public health and safety. Defendants elected to include PFAS in their AFFF products despite knowing these chemicals were dangerous and unnecessary.

8.      Defendants designed, manufactured, marketed, distributed, and/or sold AFFF Products knowing that the PFAS in these Products would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by Defendants. Despite their knowledge, Defendants kept this information hidden from the public, including the Tribe.

9.      Civilian and military airports, fire departments, industrial facilities, and military bases used AFFF Products containing PFAS for decades for firefighting and training, including the Duluth Air National Guard Base in Duluth, Minnesota, unaware of the environmental and health risk and hazards of using Defendants' AFFF Products.

10.     These sites throughout the country have been linked to contamination of surface and groundwater, as well as drinking water wells, with PFAS. The Tribe's reservations lands are the latest example, due to the widespread contamination and pollution in Lake Superior and the lake's aquatic life.

11.     Upon information and belief, the Duluth Air National Guard Base routinely used Defendants' AFFF Products in the ordinary course of business, in fire training exercises, to fight fires and to do annual testing. As a result, the PFAS Defendants used in their Products seeped into the groundwater and surface water and into a flow zone adjacent to the base, as well as from air pollution, contaminating both Lake Superior and the water wells on the Tribe's reservation lands.

12.     As a result of the contamination caused by Defendants' AFFF Products, the Plaintiff has or will have to engage in testing to try to determine the extent of the contamination, to retain consulting experts to discuss remediation, incur costs of purchasing bottled water, face

4

additional substantial costs and future expenses for remediation and medical monitoring, and their cultural practices will suffer.

13.     In 2021, the State of Wisconsin issued a fish consumption advisory that recommended eating no more than one meal a month of Lake Superior rainbow smelt. This was the first official advisory for any of the Great Lakes to warn of elevated PFAS levels in fish.

14.     Fishing is not only a primary source of subsistence, but also has deep cultural significance within the Red Cliff Tribe. By being asked to lower its fish consumption, the Tribe is losing meals, and it is also losing its historical practices and cultural life associated with fishing. It has been changing the Tribe's social dynamics, which have been of cultural significance for generations. Aside from the contamination in Lake Superior, due to the persistent and traveling nature of PFAS, the reservation's ground and surface water and soil is also being affected by PFAS contamination.

15.     Defendants' AFFF Products have created an unreasonable danger to public health and safety on the Tribe's reservation lands and to its residents. This condition must be remediated to protect the health and welfare of tribal members and to preserve culturally important social dynamics within the Tribe.

16.     As a result of the contamination caused by the Defendants, Plaintiff has had to respond proactively to protect the health and welfare of the Tribe. The Tribe is bringing this action to recover costs associated with remediation of PFAS chemicals in Tribal ground and surface water, costs associated with treating drinking water contaminated with PFAS, soil remediation, restoration of tribal fisheries, conduct of proper studies, and medical monitoring of tribal members for injuries associated with PFAS exposure.

## JURISDICTION AND VENUE

17.     Jurisdiction of this Court arises under 28 U.S.C. § 1331 as the Plaintiff is bringing a federal cause of action that raises federal question jurisdiction. This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in this District.

## PARTIES

### a.     Plaintiff

19.     The Plaintiff, Red Cliff Band of Lake Superior Chippewa Indians, is a federally recognized sovereign Indian tribe with over 7,000 tribal members. The Tribe is governed by the organic documents and laws of the Tribe and certain treaties, with its reservation lands located within the boundaries of Bayfield County, Wisconsin or the shores of Lake Superior. The Tribe exercises inherent sovereign governmental authority within the Tribe's Indian Lands and on behalf of the health and welfare of the Tribe and its members ("Tribal Members"), descendant children and grandchildren, and other inhabitants of the Tribe's Indian Lands. Members of the Tribe are affected by the actions and conduct of the Defendants both directed at or near the Tribe's Indian Lands, as well as areas outside of the Tribe's Indian Lands. Tribal Members live both on and off of the Tribe's Indian Lands.

20.     This action is brought by the Tribe in the exercise of its authority as a sovereign government on behalf of the Tribe in its proprietary capacity and under the Tribe's *parens patriae* authority in the public interest to protect the health, safety, and welfare of all Red Cliff Members as well as the non-Tribal Member inhabitants of its Indian Lands. The Tribe also brings this action to recover damages and seek other redress for harm caused by Defendants' negligence, gross

negligence, trespass, nuisance, and fraudulent transfer relating to PFAS. Defendants' actions have caused and continue to cause damages that threaten the health, safety, and welfare of the Tribe.

**b.    Defendants**

21.    The term "Defendants" refers to all Defendants named herein jointly and severally.

i.  <u>The AFFF Defendants</u>

22.    The term "AFFF Defendants" refers collectively to Defendants 3M Company, Amerex Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Chemguard Inc., Kidde-Fenwal, Inc., National Foam, Inc., Tyco Fire Products L.P., and Johnson Controls International PLC.

23.    Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

24.    Beginning before 1970 and until at least 2002, 3M designed, manufactured, distributed, and sold AFFF containing PFAS.

25.    Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

26.    Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

27.    In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

28.     Upon information and belief, beginning in 2011, Amerex designed, manufactured, marketed, distributed, and sold AFFF containing PFAS.

29.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located and One Stanton Street, La Crosse, Wisconsin 54143-2542.

30.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

31.     Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS.

32.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS.

33.     Defendants Chemguard, Inc. ("Chemguard") is a corporation organized under the law of the State of Texas, with its principal place of business located at One Stanton Street, La Crosse, Wisconsin 54143.

34.     Upon information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS.

35.     Upon information and belief, Chemguard was acquired by Tyco International Ltd. in 2011. Both Tyco and Chemguard, upon information and belief, are controlled by the Defendant Johnson Controls International PLC, an Ireland-based PLC, by and through a succession of intermediate shell companies and entities, partly in an attempt to shield Johnson Controls International PLC from AFFF-related liabilities. Plaintiff reserves the right to amend this Complaint to add these intermediate defendants that Johnson Controls International PLC controls upon necessary discovery.

8

36.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

37.     Upon information and belief, Buckeye designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS.

38.     Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

39.     Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing PFAS.

40.     Upon information and belief, National Foam currently manufactures the Angus brand of AFFF products and is a subsidiary of Angus International Safety Group.

41.     Upon information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

42.     Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

43.     Upon information and belief, Chubb was acquired by Williams Holdings in 1997.

44.     Upon information and belief, Angus Fire Armour Corporation had previously been acquired by Williams Holdings in 1994.

45.     Upon information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

46.     Upon information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

47.     Upon information and belief, Kidde P.L.C. was acquired by United Technologies Corporation in or around 2005.

48.     Upon information and belief, Angus Fire Armour Corporation and National Foam separated from United Technologies Corporation in or around 2013.

49.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

50.     Upon information and belief, Kidde-Fenwal was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies Corporation.

51.     Upon information and belief, Kidde-Fenwal is the entity that divested the AFFF business unit now operated by National Foam in 2013.

52.     Defendant Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

53.     Upon information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business before it merged with Raytheon Company in April 2020.

54.     Upon information and belief, Kidde-Fenwal became a subsidiary of Carrier when United Technologies Corporation spun off its fire and security business in March 2020.

55. Upon information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS and/or their chemical precursors that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at military bases throughout the country, including Duluth Air National Guard Base.

ii. The Fluorosurfactant Defendants

56. The term "Fluorosurfactant Defendants" refers to Defendants 3M, Arkema, Inc., BASF Corporation, ChemDesign Products Incorporated, Chemguard Inc., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours Inc., and Dynax Corporation.

57. Defendant Arkema, Inc. is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

58. Arkema, Inc. develops specialty chemicals and polymers.

59. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

60. Upon information and belief, Arkema, Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.

61. Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

62. Upon information and belief, BASF is the successor in interest to Ciba Inc. (f/k/a Ciba Specialty Chemicals Corporation).

63.     Upon information and belief, Ciba Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.

64.     Defendant ChemDesign Products Inc. ("ChemDesign") is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

65.     Upon information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.

66.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with is principal place of business located at 196122 E County Road 40, Woodward, OK 73801.

67.     Upon information and belief, Deepwater designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.

68.     Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

69.     On information and belief, Dynax entered the AFFF market on or around 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFAS.

70.     Upon information and belief, Dynax designed, manufactured, distributed, and sold fluorosurfactants and fluorochemical stabilizers for use in products containing PFAS and/or their chemical precursors for use in AFFF products.

71.     Defendant E.I. Du Pont de Nemours & Company ("DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

72.     Defendant The Chemours Company ("Chemours Co.") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware 19899.

73.     In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFAS and fluorosurfactants. Upon information and belief, Chemours Co. has supplied fluorosurfactants containing PFAS and/or their chemical precursors to manufacturers of AFFF products.

74.     Upon information and belief, Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015. From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

75.     In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly traded company.

76.     Defendant The Chemours Company FS, LLC ("Chemours FC") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

77.     Defendant Corteva, Inc. ("Corteva) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

78.     Defendant Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("DowDuPont") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

79.     On June 1, 2019, DowDuPont separated its agriculture business through its spin-off of Corteva.

80.     Corteva was initially formed in February of 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

81.     On June 1, 2019, DowDuPont distributed to its stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E.I. Du Pont de Nemours & Company.

82.     Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

83.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines

14

following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva.

84.     Defendants E.I. DuPont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this complaint.

85.     Upon information and belief, DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.

86.     Upon information and belief, 3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.

87.     Upon information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at military bases around the country, including the Duluth Air National Guard Base.

### iii.   The PFC Defendants

88.     The term "PFC Defendants" refers collectively to 3M, AGC Chemicals Americas Inc., Archroma Management, LLC, ChemDesign Products, Inc., Chemicals, Inc., Clariant Corporation, Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., DuPont de Nemours Inc., and Nation Ford Chemical Company.

89.     Defendant AGC Chemicals Americas, Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

90.     Upon information and belief, AGC was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405, Japan.

91.     AGC manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

92.     Upon information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

93.     Defendant Archroma Management, LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

94.     Upon information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

95.     Upon information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in the manufacturing of fluorosurfactants used in AFFF products.

96.     Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, Texas 77520.

97.     Upon information and belief, Chemicals, Inc. supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

98.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

99.     Upon information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz"). Upon information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

100.    Upon information and belief, Clariant supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

101.    Defendant Nation Form Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, South Carolina 29715.

102.    Upon information and belief, Nation Ford supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

103.    Upon information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

104.   Upon information and belief, the Fluorochemical Defendants supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at military bases around the country, including Duluth Air National Guard Base.

### FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

**a.    PFAS and Their Risk to Public Health**

105.   PFAS are chemical compounds containing fluorine and carbon that are not naturally occurring and must be manufactured.

106.   PFAS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

107.   PFAS are mobile because they easily dissolve in water and spread in the environment, where they can readily contaminate soils and leach from the soil into groundwater and travel significant distances.

108.   PFAS are characterized by the presence of multiple carbon-fluorine bonds that make them thermally, chemically, and biologically stable; they resist degradation due to light, water, and biological processes.

109.   Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

110.    PFAS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFAS will be added to any PFAS already present. In humans, PFAS remain in the body for years.

111.    PFAS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFAS.

112.    PFAS are persistent when released into the environment because their chemical structure makes them resistant to breakdown or environmental degradation.

113.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

114.    PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

**b.    Defendants' Manufacture and Sale of AFFF/Component Products**

115.    AFFF is a type of water-based foam first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

116.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

117.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

118.    Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing PFAS or the chemical precursors that degrade into PFAS.

119.    AFFF can be made without the fluorosurfactants that contain PFAS and/or their precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFAS and/or their precursor chemicals into the environment.

120.    3M manufactured the fluorosurfactants in its AFFF products by 3M's patented process of electrochemical fluorination ("ECF").

121.    The fluorosurfactants used in other AFFF products sold by the AFFF Defendants were manufactured by the Fluorosurfactant Defendants through the process of telomerization.

122.    The PFCs the Fluorosurfactant Defendants needed to manufacture those fluorosurfactants contained PFAS and/or their chemical precursors, and were designed, manufactured, marketed, distributed, and/or sold by the PFC Defendants.

123.    Upon information and belief, the PFC and Fluorosurfactant Defendants were aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in AFFF products designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants.

124.    Upon information and belief, the PFC and Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the AFFF products discharged into the environment at military bases around the country, including the Duluth Air National Guard Base, during fire protection, training, and response activities, resulting in widespread PFAS contamination.

125.    Upon information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment at military bases around the country, including the Duluth Air National Guard Base, during fire protection, training, and response activities, resulting in widespread PFAS contamination.

c.     **Defendants' Knowledge of the Threat to Public Health and the Environment Posed by PFAS**

126.    Upon information and belief, by at least the 1970s, 3M and DuPont knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

127.    Upon information and belief, 3M and DuPont concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFAS.

128.    Some or all of the Defendants knew and understood from their first sale to a customer that the fluorinated surfactants used in AFFF are stable when released into the environment, yet they failed to warn the public or provide reasonable instruction on how to manage wastes generated from those products.

i.     1940s and 1950s: Early Warnings About the Persistence of AFFF

129.    In 1947, 3M started its fluorochemical program, and within 4 years, it began selling its PFAS to DuPont. The persistence and contaminating nature of the fluorosurfactants contained in AFFF products were understood prior to the commercial application at 3M's Cottage Grove facility in Minnesota.

130.    The inventor of the 3M ECF process was J.H. Simons. Simons' 1948 patent for the ECF process reported that the PFCs are "non-corrosive, and of little chemical reactivity," and "do not react with any of the metals at ordinary temperatures and react only with more chemically reactive metals such as sodium, at elevated temperatures." Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf (last accessed June 27, 2022).

131.    Simons further reported that fluorosurfactants produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural process in the environment. Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf (last accessed June 27, 2022).

132.    The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production. Simons' patent application further discloses that the fluorosurfactants produced in the ECF process were thermally stable at temperatures up to 750° C (1382° F). Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds. Bryce, T. J., 1950. Fluorocarbons – Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

133.    Upon information and belief, nowhere in any Material Safety Data Sheet for any of Defendants' AFFF/Component Products is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the PFCs and fluorosurfactants used in AFFF products to consumers is a failure to warn just how indestructible the AFFF's ingredients are when released to unprotected water sources and even treatment plants.

ii.   1960s: AFFF's Environmental Hazards Come into Focus

134.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including PFAS, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

135.    One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; <u>there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon</u>." Bryce, H. G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964) *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf (last accessed June 27, 2022). Thus, 3M knew by the mid-1960s that its manufactured surfactants were immune to chemical and biological degradation in soils and groundwater.

136.    3M also knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions. Later studies by 3M on the absorption and mobility of FC-95 and FC-143 (the ammonium salt of PFAS) in soils indicated very high solubility and very high mobility in soils for both compounds. Technical Report Summary re: Absorption of FC 95 and FC 143 on Soil, Feb. 27, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf (last accessed July 27, 2022).

> iii.    <u>1970s: Internal Studies Provide Evidence of Environmental and Health Risks</u>

137.    By 1950, 3M knew that the PFAS used in its AFFF product(s) would not degrade when released into the environment but would remain intact and persist. Two decades later, in the 1970s – and after the establishment of a robust market of AFFFs using fluorosurfactants – 3M got around to looking at the environmental risks that fluorosurfactants posed.

138.    An internal memo from 3M in 1971 states that the "thesis there is 'no natural sink' for fluorocarbons obviously demands some attention." Memorandum from H.G. Bryce to R.M. Adams re: Ecological Aspects of Fluorosurfactants, Sept. 13, 1971, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf (last accessed June 27,

2022). Hence, 3M understood at the very least that the fluorosurfactants used in its AFFF products would, in essence, never degrade once released into the environment.

139.    By the mid-1970s, 3M and Ansul (and possibly other Defendants) had an intimate understanding of the persistent nature of PFCs. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFAS; a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated." Technical Report Summary, August 12, 1976, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf (last accessed July 27, 2022).

140.    In 1977, Ansul authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality. Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, La Crosse, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/ dtic/tr/fulltext/u2/a050508.pdf (last accessed July 27, 2022). Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristics … improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have reduced impact on the environment without loss of fire suppression effectiveness." *Id*. Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet, upon information and belief, there is no evidence that Ansul (or any other Defendant) ever pursued initiatives to do so.

141.    A 1978 3M biodegradation study likewise reported that an "extensive study strongly suggest[ed]" one of its PFCs is "likely to persist in the environment for extended period

unaltered by metabolic attack." Technical Report Summary re: Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons – II, Jan. 1, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf (last accessed July 27, 2022). A year later, a 3M study reported that one of its fluorosurfactants "was found to be completely resistant to biological test conditions," and that it appeared waterways were the fluorosurfactant's "environmental sink." Technical Report Summary re: Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons – III, July 19, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1179.pdf (last accessed July 27, 2022).

142.    In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978. Technical Report Summary, Final Comprehensive Report on FM 3422, Feb. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf (last accessed June 27, 2022). More than a decade after 3M began selling AFFF containing fluorosurfactants, it wrote: "there has been a general lack of knowledge relative to the environmental impact of these chemicals." The report ominously asked, "If these materials are not biodegradable, what is their fate in the environment?"

143.    During the 1970s, 3M also learned that the fluorosurfactants used in AFFF accumulated in the human body and were "even more toxic" than previously believed.

144.    In 1975, 3M learned that PFAS was present in the blood of the general population. Memorandum from G.H. Crawford to L.C. Krogh et al. re: Fluorocarbons in Human Blood Plasma, Aug. 20, 1975, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf (last accessed June 27, 2022). Since PFAS are not naturally occurring, this finding should have

alerted 3M to the possibility that their products were a source of the chemicals. The finding should have alerted 3M to the possibility that PFAS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain how the chemicals from 3M's products ended up in human blood.

145.     In 1976, 3M found PFAS in the blood of its workers at levels "up to 1,000 times 'normal' amounts of organically bound fluorine in their blood." 3M Chronology – Fluorocarbons in Blood, Aug. 26, 1977, *available at* https://www.ag.state.mn.us/ Office/Cases/3M/docs/PTX/PTX1144.pdf (last accessed June 27, 2022). This finding should have alerted 3M to the same issues raised by the prior year's findings.

146.     In 1979, 3M and DuPont discussed 3M's discovery of PFAS in the blood of its workers and came to the same conclusion that there was "no reason" to notify the EPA of the finding. Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/ Office/Cases/3M/docs/PTX/PTX2723.pdf (last accessed June 27, 2022).

iv.   1980s and 1990s: Evidence of AFFF's Health Risks Continues to Mount

147.     By at least the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated river enzymes and birth defects, had been observed amount workers exposed such materials, including at least PFAS, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

148.     In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation

potential and ecotoxicity of fluorochemicals in the environment." 3M Environmental Laboratory (EE & PC), Fate of Fluorocarbons – Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf (last accessed June 27, 2022). That same year, 3M completed a study finding that PFAS caused the growth of cancerous tumors in rats. Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf (last accessed June 27, 2022). This finding was later shared with DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals." Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, Jan. 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf (last accessed June 27, 2022).

149.    In 1984, 3M documented a trend of increasing levels of PFAS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo: "we must view the present trend with serious concern. It is certainly possible that… exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body." Memorandum from D.E. Roach to R.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf (last accessed June 37, 2022).

150.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cites "1983 and 1993

studies conducted jointly by 3M and DuPont" as support for this statement. Upon information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

v.   Defendants Hid What They Knew from the Government and the Public

151.   Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8€, 15 U.S.C. § 2607(e).

152.   In April of 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for 244 violations of the TSCA, which included violations for failing to disclose studies regarding PFAS dating back decades.

153.   Likewise, in December of 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFAS.

154.   Upon information and belief, Defendants knew or should have known that AFFF containing PFAS would very likely injury and/or threaten public health and the environment, even when the products were used as intended or directed.

155.   Defendants failed to warn of these risks to the environment and public health, including the impact of their AFFF/Component Products on the quality of unprotected water sources.

156.   Defendants were all sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing AFFF/Component Products. They understood far more about the properties of these products – including the potential hazards they posed to human health

and the environment – than members of the public. Still, Defendants declined to use this sophistication and knowledge to design safer products.

      **d.**    **The Impact of PFAS on the Environment and Human Health is Revealed**

     157.    As discussed above, neither 3M, DuPont, nor, on information and belief, any other Defendant complied with their obligations to notify the EPA about the "substantial risk of injury to health or the environment" posed by their AFFF/Component Products. *See* TSCA § 8(e).

     158.    Despite decades of research, 3M first shared its concerns with the EPA in the late 1990s. In May of 1998, in a report submitted to the EPA: "3M chose to report simply that PFAS had been found in the blood of animals, which is true but omits the most significant information," according to a former 3M employee. Letter from R. Purdy, Mar. 28, 1999, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf (last accessed June 27, 2022).

     159.    Upon information and belief, 3M began, in 2000, to phase out its production of PFAS-containing products in response to pressure from the EPA.

     160.    Human health effects associated with PFAS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and high cholesterol. In laboratory testing on animals, PFAS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

     161.    The injuries caused by PFAS can arise months or years after exposure.

     162.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or

risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

163.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFAS. *Revisions to the Unregulated Contaminant Monitoring Regulation (UMCR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

164.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFAS, called for greater regulation, restrictions, limits on the manufacture and handling of any PFAS-containing product and to develop non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment. Blum A., Balan S.A., Scheringer M., Trier X., Goldenman G., Cousins I.T., Diamond M., Fletcher T., Higgins C., Lindeman A.E., Peaslee G., de Voogt P., Wang Z., Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Eviron. Health Perspect. 123:A107-A111; *available at* https://ehp.niehs.nih.gov/doi/pdf/10.1289/ehp.1509934 (last accessed June 27, 2022).

165.    In 2022, the EPA released updated health advisory (HA) levels for PFAS, specifically PFOA and PFOS. Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS, *available at:* https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs (last accessed June 27, 2022). The EPA HAs identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.004 parts per trillion (PFOA) and 0.02 parts per trillion (PFOS). *Id*. The HAs are based on peer-

30

reviewed studies of the effects of PFAS on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFAS. These studies indicate that exposure to PFAS over these levels may result in adverse health effect including:

a.     Developmental effects to fetuses during pregnancy or to breast-fed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

b.     Cancer (testicular and kidney);

c.     Liver effects (tissue damage);

d.     Immune effects (e.g., antibody production and immunity);

e.     Thyroid disease and other effects (e.g., cholesterol changes).

**e.     Contamination in Lake Superior Caused by Use of PFAS-Containing Products**

166.     Through the continued use of PFAS-containing products over decades, the chemicals manufactured, distributed, and/or sold by the Defendants have traveled into the waterways in the United States. PFAS have been detected in the surface water of Lake Superior, as well as in fish samples taken from the lake. According to public records, samples have shown levels surpassing the limits announced by the EPA. Specifically, in fish samples, while other chemicals tested for show levels falling the range of 0-2ng/g, the levels for PFOS show as high as 24.1, 32.4, 47.3, and 97.3ng/g. Lake Superior 2017-2021 Query, Wisconsin Department of Natural Resources. The sampling is still ongoing today.

167.     Based on the findings, the State of Wisconsin recommended a PFAS-based fish consumption advisory for Lake Superior – one meal per month. New Smelt Consumption Advisory for Lake Superior, *available at* https://dnr.wisconsin.gov/newsroom/release/40496 (last accessed June 27, 2022).

168.     Plaintiff has incurred and will incur expenses to deal with the contaminated water and infrastructure modifications to ensure its reservation lands and Lake Superior contain clean and safe water and aquatic life. Plaintiff will incur future sampling and remediation costs for PFAS that have traveled through the waterways and into its soil and ground and surface water.

## COUNT I – RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961 et seq.

169.     Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

170.     Defendants conduct their business through illegitimate means in an association-in-fact enterprise and/or legal entity enterprise.

171.     Defendants are persons under 18 U.S.C. § 1961(3) because they are entities holding a legal or beneficial interest in property.

172.     Defendants have aggressively sought to increase and generate profits from the PFC and AFFF markets by unlawfully withholding information from government agencies, including the EPA.

173.     Federal law requires the Defendants to notify the EPA if they have information that reasonably supports the conclusion that a substance or mixture presents a substantial risk of injury to health or the environment. Therefore, Defendants are not permitted to limitless expand the PFC and AFFF markets through increased sales of their PFAS-containing products.

174.     The precautionary measures created by the federal government and the EPA were intentionally established to reduce or eliminate the potential harm to the environment or health of the public.

175.     The Defendants found it impossible to maximize profits within the legal framework of the EPA. Choosing illegal profits over law, Defendants systematically and fraudulently violated

their statutory duties of maintaining effective reporting measures through the intentional failure to inform of substantial risk of injury. As a result, Defendants illegally increased and continued production of their PFAS-containing products.

176.   The term "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals association in fact although not a legal entity." 18 U.S.C. § 1961(4). The definition of "enterprise" in § 1961(4) includes both legitimate and illegitimate enterprises.

177.   Defendants forged an association-in-fact enterprise to perpetuate their illegal scheme of continuing the manufacturing, distributing, marketing, and sales of PFAS-containing products without informing the EPA of potential substantial injury to health and to the environment that was known to the Defendants. As a direct result of Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, Defendants were able to extract billions of dollars in profit, while Plaintiff suffered and is currently suffering from the contaminants put into the environment by the Defendants.

178.   At all relevant times. Defendants operated as an enterprise formed for the purpose of unlawfully continuing and increasing sales of PFAS-containing products, allowing them to collectively benefit from increased profits.

179.   At all relevant times, the RICO Enterprise: (a) existed separately and distinctly from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Defendants; (d) characterized by interpersonal relationships among the Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the RICO Enterprise participated in the conduct of the

enterprise, including patterns of racketeering activity, and shared in the astonishing growth of profits supplied by fraudulently inflating PFC and AFFF sales generated as a result of the RICO Enterprise's disregard for their duty to inform the EPA of potential substantial injury caused by those products.

180.    The RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across state lines, such as manufacture, sale, distribution, and shipment of PFC and AFFF throughout the United States and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

181.    Plaintiff has injuries and damages that were directly caused by the Defendants' racketeering activities.

182.    Plaintiff seeks all legal and equitable relief as allowed by law, including actual damages, compensatory damages, equitable relief, punitive damages, exemplary damages, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest, as well as costs and damages for remediation and abatement of the PFAS chemicals.

## **COUNT II – NEGLIGENCE**

183.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

184.    This cause of action is brought pursuant to Wisconsin law.

185.    Defendants failed to employ reasonable care, which a reasonably prudent person should use under the circumstances by transporting, manufacturing, using, utilizing, storing, handling, and/or disposing of toxic substances, specifically PFAS, in a way permitting its release into the soil, groundwater, and Lake Superior.

186.    The contamination of the water and aquatic life in Lake Superior and its impact on Plaintiff's reservation lands was a foreseeable consequence of Defendants' actions.

187.    Defendants owed Plaintiff a cognizable duty to exercise reasonable care in transporting, testing, manufacturing, using, utilizing, storing, handling, environmental release, and/or disposing of toxic substances, specifically PFAS.

188.    Upon learning of the release of toxic substances, including but not limited to PFAS, Defendants owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the release before it reached and contaminated Lake Superior and Plaintiff's water supply, as well as warn buyers, consumers, and residents of the toxicity of the PFAS.

189.    Defendants breached that duty by failing to act reasonably in the transporting, testing, manufacturing, using, utilizing, storing, handling, and/or disposing of toxic substances, specifically PFAS, and failing to warn anyone of the toxicity and dangers.

190.    Defendants failed to take reasonable, adequate, and sufficient steps or action to eliminate, correct, or remedy a release of PFAS after it occurred, as well as failing to warn anyone of the toxicity and dangers of PFAS.

191.    Defendants negligently breached their duties to Plaintiff to ensure that their transporting, testing, manufacturing, using, utilizing, storing, handling, and/or disposing of PFAS was carried out in a safe and sufficiently secure manner as to prevent the release of PFAS into the environment surrounding their facilities and, consequently, Lake Superior and the reservation lands.

192.    Defendants' breach of their duties was the direct, sole, and/or proximate or arbitrary cause of Plaintiff's damages as alleged herein and imminent, substantial, and impending harm to Plaintiff.

193.    Defendants negligence was grossly negligent, willful, wanton, and/or in reckless disregard of the Plaintiff's rights, such that punitive damages should be awarded.

194.    Plaintiff seeks compensatory damages and punitive damages in a sum determined by a jury, as well as costs and damages for remediation and abatement of the PFAS chemicals.

<u>**COUNT III – STRICT LIABILITY**</u>

195.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

196.    This cause of action is brought pursuant to the laws of Wisconsin.

197.    Defendants' manufacturing, use, operational, and disposal practices as it related to material and AFFF/Component Products contaminated with PFAS and/or other ultrahazardous toxins was negligent, reckless, and/or intentional and constituted an ultrahazardous or abnormally dangerous activity for which Defendants are strictly liable.

198.    The Defendants' manufacture, use, mishandling, and disposal of material and products that contained PFAS was inappropriate, given PFAS's toxicity and danger to human health and the proximity of the Tribe's reservation grounds to the sources of drinking water and Lake Superior.

199.    As a result, Defendants allowed or caused these ultrahazardous and abnormally dangerous substances to leach into the land and groundwater within the Tribe's reservation, including the water supply relied on by Plaintiff.

200.    Further, Defendants' contamination of the water supply and aquatic life in Lake Superior with PFAS created the likelihood for personal injury and property damage to individuals who use and rely upon the water and the fisheries.

201.    Defendants' manufacture, use, mishandling, and disposal of PFAS and their reckless disregard for the consequences of their actions caused the existence of a high degree of harm to both the Plaintiff and its property. Given the nature of PFAS, the likelihood of harm was great.

202.    The risk of such activities outweighs any value associated with the same. As the result of the said ultrahazardous or abnormally dangerous activities, Plaintiff has suffered damages and imminent, substantial, and impeding harm to the health of its members, their families, to the value of the reservations land, the Tribe's longstanding cultural practices, and Plaintiff has expended and will continue expending significant resources to safeguard its property, obtain monitoring, testing, remediating services and equipment.

203.    Defendants are strictly liable in tort for personal injury and property damage sustained by the Plaintiff.

204.    Accordingly, Plaintiff seeks general damages from Defendants, in an amount to be determined at trial, directly resulting from its injuries in a sufficient amount to compensate the Tribe for those injuries and losses and to restore Plaintiff to its original position, as well as costs and damages for remediation and abatement of the PFAS chemicals

## COUNT IV – PRODUCT LIABILITY

205.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

206.    This cause of action is brought pursuant to the laws of Wisconsin.

207.    Defendants' manufacturing, use, operational, and disposal practices as it related to material and AFFF/Component Products contaminated with PFAS and/or other toxins led to

products that were in a defective condition, which were unreasonably dangerous to buyers, end users, and properties.

208. Defendants are engaged in the business of selling these such AFFF/Component Products.

209. The AFFF/Component Products were expected to and did reach the consumers and users without substantial change in the condition in which they were sold.

210. Defendants failed to warn buyers, users, and the public of the dangers of AFFF/Component Products contaminated with PFAS, as well as the inevitable spread of these toxins throughout groundwater, surface water, aquatic life, mammals, and/or humans.

211. Plaintiff seeks compensatory damages and punitive damages in a sum determined by a jury, as well as costs and damages for remediation and abatement of the PFAS chemicals.

## COUNT V – TRESPASS

212. Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

213. This cause of action is brought pursuant to the laws of Wisconsin.

214. Plaintiff is the Red Cliff Tribe, who resides on its reservation lands located in the Lake Superior basin. Plaintiff retains the right to fish, hunt, and gather on reservation lands and in Lake Superior under its 1854 treaty. Defendants, their agents, and their employees knew, or should have known, that their PFAS chemicals are extremely hazardous to groundwater, lakes, and aquatic life within those lakes, including the property and other rights of the Plaintiff.

215. Defendants so negligently, recklessly, and/or intentionally failed to properly control, apply, use, and/or dispose of PFAS contaminants, such that they proximately caused and continue to cause said contaminants to contaminate Plaintiff's groundwater and resources.

216.    The contamination has varied over time and has not yet ceased. PFAS continue to migrate into and enter Lake Superior. The contamination is reasonably abatable.

217.    Plaintiff has not consented to, and does not consent to, this contamination.

218.    Defendants knew, or should have known, that the Plaintiff would not consent to this trespass onto the land and water it has rights to under its longstanding treaty.

219.    At the time the above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause PFAS be disbursed onto lands and into the lakes.

220.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused a large quantity of PFAS to be released into the water and aquatic life for the Plaintiff.

221.    Defendants' willful, wanton, and intentional failure to act and/or their affirmative choices of actions and following courses of actions have caused PFAS to enter and trespass upon the land the Plaintiff has rights to and cause injury to those rights.

222.    Additionally, and/or alternatively, Defendants' decisions to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the PFAS exposure and contamination after having knowledge and notice of said contamination were done with actual malice, and in wanton, willful, and/or reckless disregard for the rights, health, and property of the Plaintiff.

223.    Accordingly, the Plaintiff seeks general damages from Defendants, in an amount to be determined at trial, directly resulting from its injuries in a sufficient amount to compensate it for the injuries and losses and to restore Plaintiff to its original position, including but not limited to the repair and restoration of the property and such has not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential and nominal damages

flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial, as well as costs and damages for remediation and abatement of the PFAS chemicals.

### COUNT VI – FRAUDULENT TRANSFER
### (DuPont and Chemours Co.)

224.     Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

225.     Through the effectuation of the Spinoff, Chemours Co. and DuPont caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

226.     The Transfers and Assumed Liabilities were made for the benefit of DuPont.

227.     At the time that the Transfers were made, and the Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

228.     DuPont and Chemours Co. made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

229.     Plaintiff has been harmed because of the conduct of DuPont and Chemours Co.

230.     Plaintiff is entitled to avoid the Transfers and recover property or value transferred to DuPont.

### COUNT VII – NUISANCE

231.     Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

40

232.    This cause of action is brought pursuant to Wisconsin law.

233.    Defendants' reckless, intentional, and unreasonable, abnormally dangerous, and/or negligent acts and omissions, as alleged above, resulted in the discharge of PFAS in the environment, contaminating Lake Superior, from which Plaintiff obtains its fish.

234.    The discharge of PFAS in the environment resulted in the contamination of Lake Superior and its basin with hazardous levels of PFAS.

235.    The contamination has prevented and continues to prevent Plaintiff from safely consuming fish, having enough meals, and sharing knowledge based on cultural practices and constitutes a substantial interference with the Plaintiff's rights.

236.    The inability to have safe-to-consume fish has caused the Plaintiff significant inconvenience and expense both financially and culturally.

237.    By reason the forgoing, Defendants are liable to the Plaintiff for the damages it has suffered because of Defendants' actions, the amount of which will be determined at trial.

238.    Accordingly, Plaintiff seeks damages from Defendants directly resulting from its injuries in a sufficient amount to compensate for injuries and loss and to restore Plaintiff to its original position, including but not limited to, the difference in the value of the rights to reservation lands and Lake Superior and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and direct, consequential, and nominal damages resulting from the nuisance and trespass which are the natural and proximate result of Defendants' conduct, as well as costs and damages for remediation and abatement of the PFAS chemicals.

**PUNITIVE DAMAGES**

239.    Plaintiff hereby repeats, realleges, and reiterates each allegation in the preceding

paragraphs as if fully restated herein.

240.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and/or reckless conduct that caused the foregoing injuries, property damage, nuisances, and trespasses upon the persons and properties of Plaintiff, disregarding its protected rights.

241.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measure to ensure PFAS containing materials would be effectively disposed of and not discharged into the surrounding environment and groundwater supplies.

242.    Defendants have caused great harm to the property and natural resources of the Tribe and demonstrated an outrageous conscious disregard for the safety of the Tribe with implied malice, warranting the imposition of punitive damages.

243.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the public health and welfare of the Tribe. Therefore, Plaintiff requests an award of punitive damages in an amount enough to punish the Defendants and that fairly reflects the aggravating circumstances alleged herein.

244.    Defendants are strictly, jointly, and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other reliefs set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, RED CLIFF BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, as to each and every count herein, demands judgment against Defendants, and each of them, individually, jointly, and severally, and request the following relief:

a.  A jury trial and finding or declaration that Defendants engaged in tortious conduct, including negligence, strict liability, racketeering, trespass, nuisance, fraudulent transfer, and/or willful, wanton, and careless disregard for the health, safety, property, and culturally significant values of Plaintiff;

b.  An award to Plaintiff for all economic and non-economic damages, including general, compensatory, consequential, and incidental damages;

c.  An order for an award of attorney fees and costs, as provided by law;

d.  An award of pre-judgment and post-judgment interest as provided by law;

e.  Equitable or injunctive relief;

f.  Compensatory damages according to proof including, but not limited to:

   i.  Costs associated with the remediation or abatement of PFAS chemicals in Tribal ground  and surface water;

   ii.  Costs associated with treating drinking water contaminated with PFAS;

   iii.  Costs associated with soil remediation of PFAS;

   iv.  Costs associated with restoration of Tribal fisheries;

   v.  Diminution of property value caused by PFAS contamination;

   vi.  Damages to the Tribe's culture caused by PFAS contamination; and

   vii.  Medical monitoring of tribal members for injuries associated with PFAS exposure.

g.  An order barring transfer of DuPont's liabilities for the claims brought in this Complaint.

h.  An award of punitive damages in an amount sufficient to punish Defendants and to deter Defendants from engaging in similar wrongful conduct in the future; and

i.  An order for all such other relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues in the matter.

Dated, this the 6th day of October, 2022,

Respectfully submitted,

**THE RED CLIFF BAND OF**
**LAKE SUPERIOR CHIPPEWA INDIANS**


*/s/T. Roe Frazer II*
T. Roe Frazer II
**Frazer PLC**
30 Burton Hills Boulevard, Suite 450
Nashville, TN 37215
(615) 647-6464
roe@frazer.law


**CO-COUNSEL (to be admitted *pro hac vice*):**

James G. Onder
W. Wylie Blair
Angela N. Mozdzierz
**ONDER LAW, LLC**
110 E. Lockwood, 2nd Floor
St. Louis, MO 63119
onder@onderlaw.com
blair@onderlaw.com
mozdzierz@onderlaw.com